UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

HEAT & POWER PRODUCTS, INC.,

        Plaintiff,

v.                                              Case No. 07-C-639

CAMUS HYDRONICS LTD.,

        Defendant.

**DECISION AND ORDER**

Plaintiff Heat & Power Products, Inc. ("HPP"), of Little Chute, Wisconsin, sued defendant Camus Hydronics Ltd., a Canadian manufacturer of boilers and boiler systems. Plaintiff alleges that Camus violated the Wisconsin Fair Dealership Law ("WFDL") when it terminated an exclusive distributorship agreement for selling boilers in Wisconsin and Upper Michigan. HPP initially brought a motion for a temporary restraining order and preliminary injunction; following consultation with the parties, the motion was refiled and set for an expedited briefing schedule. A hearing on the motion was set for September 14. Having read the briefs and heard argument from both sides, I conclude that HPP does not have a strong enough likelihood of eventual success to allow entry of the preliminary equitable relief it now seeks. In addition, the other elements justifying an injunction are absent. Accordingly, the motion for preliminary injunctive relief will be denied.

**I. Background**

HPP, a company of ten employees, describes itself as the leading commercial and industrial boiler room equipment supplier in Wisconsin and the Upper Peninsula of Michigan. Having been in business for 35 years, it claims unparalleled expertise in the boiler industry and states that it has a golden reputation among its customers.

Given HPP's strong position in the business, Camus, a relative newcomer in the boiler industry, selected HPP in 2005 as its exclusive representative in Wisconsin and Upper Michigan. As Camus' representative, HPP would take orders from customers and then purchase the boiler equipment from Camus. In this "buy / resell" relationship, Camus would then generally ship the boiler to the customer directly. (Pollack Decl., Ex. A at 13.) In other words, apart from carrying a small amount of Camus parts, HPP did not actually warehouse boilers or have any in stock; nor was there anything like a showroom featuring Camus products.

In 2005, the first year of their relationship, HPP sold $127,835 worth of Camus products. The next year – the only full calendar year the two parties did business – sales jumped to $613,356. And by June of this year, HPP had sold some $469,894 worth of Camus products, setting a pace to exceed one million dollars in sales for the year. HPP sold numerous other products, however, and states that sales of Camus products totaled roughly 15% of its total sales in 2007, although in his deposition HPP's owner indicated that the number was closer to 12% for 2007 and less than 6 percent in 2006. (*Id.* at 56-57.) Similarly, Camus products accounted for between 7 and 11 percent of HPP's profits during their relationship. (*Id.* at 59-60.)

When HPP signed on with Camus, it entered into a Representative's Agreement. The agreement required HPP to devote its best efforts to selling Camus products and to refrain from

2

selling products that competed with certain Camus products. (Darling Decl., Ex. 1 § B3.) This latter clause has formed the basis of the present dispute. In a December 2006 email, Camus president Mario Ruscio stated that he "noticed we seem to get little recognition for any of your marketing efforts but instead the focus continues to be on Patterson Kelly," a direct competitor in the boiler industry. (Ruscio Decl., Ex. E.) Ruscio stated that he knew HPP had been representing Patterson-Kelly when they signed the Representative's Agreement in 2005. Nevertheless, Ruscio had hoped during the interim that "we could convince you to drop that line in favor of Camus." (*Id.*) He concluded by noting that Camus would "love to continue working together" but that "we must have a dedicated representative in order to get full proper coverage." (*Id.*)

HPP remained unwilling to drop the Patterson-Kelly line. On February 7, Ruscio sent another email expressing his intent to terminate the relationship. He noted that the relationship had been successful, but that HPP's continued representation of Patterson-Kelly, Ruscio believed, would limit Camus' ability to fully succeed in the market. "This is the toughest rep decision I have had to make to this date," he noted, and concluded by stating that the decision "was not based on your performance or abilities for selling our product but rather the fact that carrying both lines will affect the progress of our market penetration." (Darling Decl., Ex. 6.)

HPP responded by noting that the WFDL prohibited unilateral termination without notice and a right to cure being offered. In April, Camus attempted to comply with the WFDL by sending a "Notice of Termination and Right to Cure" letter. The letter indicated that Camus did not agree that HPP was a "dealer" under the WFDL. Nevertheless, Camus stated its reasons for the termination – HPP was selling competitors' products, in violation of the Representative's Agreement – and gave HPP 60 days to stop selling such products. If HPP failed to do so, the letter

3

stated that the relationship would end in 90 days. (Darling Decl., Ex. 4.)[1] Additional details of the parties' relationship prior to the breakup are set forth in Section IV below.

**II. Preliminary Injunctive Relief**

In order to obtain preliminary injunction, a movant must show that (1) he has a reasonable likelihood of success on the merits; (2) no adequate remedy at law exists; (3) he will suffer irreparable harm which, absent injunctive relief, outweighs the irreparable harm the respondent will suffer if the injunction is granted; and (4) the injunction will not harm the public interest. *Goodman v. Illinois Dept. of Financial and Professional Regulation,* 430 F.3d 432, 437 (7th Cir. 2005). The purpose of an injunction is to maintain the *status quo*, although in the WFDL context the Seventh Circuit has noted that this stated purpose is somewhat untrue. *Praefke Auto Elec. & Battery Co. v. Tecumseh Prods. Co.,* 255 F.3d 460, 464 (7th Cir. 2001). The parties – as here – might have signed a contract that allows termination for any reason on thirty days' notice, but issuance of a preliminary injunction would *change* their contract and impose a dealership despite the parties' own agreement. In any event, there is no doubt that a preliminary injunction is an extraordinary remedy requiring the movant to make a clear showing of his right for relief. *Goodman,* 430 F.3d at 437.

**III. Wisconsin Fair Dealership Law**

In order to be entitled to the protections of the WFDL, a plaintiff must have been operating a "dealership."[2] The statute defines a dealership as:

---

[1] Strangely, HPP claims it was "dumbfounded" by the termination, despite Ruscio's complaints on the same issue dating back to December. (Pltf. Br. at 10.)

[2] The parties have helpfully conceded other potential issues and have focused solely on whether a dealership existed and, if so, whether there was good cause for termination.

4

> A contract or agreement, either expressed or implied, whether oral or written, between 2 or more persons, by which a person is granted the right to sell or distribute goods or services, or use a trade name, trademark, service mark, logotype, advertising or other commercial symbol, in which there is a community of interest in the business of offering, selling or distributing goods or services at wholesale, retail, by lease, agreement or otherwise.

Wis. Stat. § 135.02(3). The operative term is "community of interest." In determining whether a community of interest exists, the Wisconsin Supreme Court has held that two "guideposts" should inform a court's analysis: (1) whether the grantor and grantee of the alleged dealership had "a continuing financial interest in their business relationship" and (2) their "interdependence, the degree to which the dealer and grantor cooperate, coordinate their activities and share common goals in their business relationship." *Ziegler Company, Inc. v. Rexnord, Inc.,* 407 N.W.2d 873, 879 (1987). In assessing these guideposts, the *Ziegler* court held, courts should further look to "a wide variety of facets, individually and in their totality, as evidenced in the actual dealings of the parties and in their contract or agreement." *Id.* The facets enumerated by the court include:

> how long the parties have dealt with each other; the extent and nature of the obligations imposed on the parties in the contract or agreement between them; what percentage of time or revenue the alleged dealer devotes to the alleged grantor's products or services; what percentage of the gross proceeds or profits of the alleged dealer derives from the alleged grantor's products or services; the extent and nature of the alleged grantor's grant of territory to the alleged dealer; the extent and nature of the alleged dealer's uses of the alleged grantor's proprietary marks (such as trademarks or logos); the extent and nature of the alleged dealer's financial investment in inventory, facilities, and good will of the alleged dealership; the personnel which the alleged dealer devotes to the alleged dealership; how much the alleged dealer spends on advertising or promotional expenditures for the alleged grantor's products or services; the extent and nature of any supplementary services provided by the alleged dealer to consumers of the alleged grantor's products or services.

407 N.W.2d at 879-80.

In trying to make some sense of these numerous facets and guideposts, courts have tended overwhelmingly to emphasize certain motifs that run through the analysis. Most prominent among these is the question of whether the alleged dealer has made significant financial investments particular to the dealership relationship in question, i.e., what courts refer to as "sunk" costs. This emphasis is not an invention of the federal courts, as some have suggested, but instead is a common theme found in many of the *Ziegler* facets themselves.[3] The length of the relationship; the nature of the parties' obligations; the efforts and expenses incurred by the alleged dealer to promote the product; the investment in inventory or other facilities; spending on advertising – these facets can all evidence an alleged dealer's investment in a business relationship that will come to naught if the relationship is suddenly terminated. Indeed, the business with significant unrecoverable costs is precisely the kind of business needing protection from being exploited by the grantor or, as the Seventh Circuit has put it, being put "over a barrel." *Praefke Auto Elec. & Battery Co. v. Tecumseh Prods. Co.,* 255 F.3d 460, 464-65 (7th Cir. 2001). In this scenario, the "fair" dealership law most lives up to its name.[4]

Another principal focus is the amount of business the alleged dealer receives by virtue of his relationship with the grantor. As with a dealer who expends significant sunk costs, one whose

---

[3]*Frieburg Farm Equipment, Inc. v. Van Dale, Inc.,* 978 F.2d 395, 399 (7th Cir. 1992) ("Some have opined that federal diversity courts impose stricter requirements upon alleged dealers than do Wisconsin state courts . . . but we do not believe this to be the case.")

[4]Put another way, there is nothing inherently "unfair" about ending a business relationship *merely* because it is long-lasting, or the alleged dealer might use various of the grantor's trademarks, or the products sold amounted to a certain percentage of sales; the WFDL does not protect ongoing dealership relationships solely out of legislative favoritism of inertia or a nostalgic preference for the status quo. It is generally only when the dealer has significant grantor-specific investments that it would be unfair for the grantor to back out without certain protections afforded the dealer.

6

business is largely reliant on the business relationship with the grantor can find himself subject to exploitation. Though courts stress there are no fixed percentages required, the relationship must be significant enough that the dealer's "interest in [the] business relationship [is] great enough to threaten the financial health of the dealer, if the grantor were to decide to exercise its power to terminate." *Central Corp. v. Research Products Corp.,* 2004 WI 76, 681 N.W.2d 178, 188 (2004).[5] Thus, disappointment in lost future profits is not enough unless the loss actually threatens the "financial health" of the alleged dealer. As the Seventh Circuit has summarized the law:

> Our cases have distilled the principles underlying the Wisconsin cases, and provide that a community of interest may exist under one of two circumstances: first, when a large proportion of an alleged dealer's revenues are derived from the dealership, and, second, when the alleged dealer has made sizable investments (in, for example, fixed assets, inventory, advertising, training) specialized in some way to the grantor's goods or services, and hence not fully recoverable upon termination.

*Frieburg Farm Equipment, Inc. v. Van Dale, Inc.,* 978 F.2d 395, 399 (7th Cir. 1992).

Ultimately, as recognized by the Seventh Circuit, the *Ziegler* facets have little to do with enforcing a "fair" dealership regime if they are unmoored from these two underlying considerations. They are helpful in that they may be suggestive of the earmarks of a community of interest, but the absence of concrete sunk investments or substantial revenues reliant on the relationship may undermine their usefulness and rebut their probative value.

**IV. HPP was not a "Dealership" and is thus unlikely to succeed on the merits**

Both sides recognize that a court should not proceed as if resolution of the issue were the product of some sort of numerical tally of facets and guideposts. Instead, a court must use common sense and consider the purpose of the WFDL in determining whether a plaintiff was operating a

---

[5]There is some suggestion that the *Central Corp.* case changed the "community of interest" analysis, but that case merely restated the *Ziegler* factors.

7

"dealership." Indeed, even the *Ziegler* court noted that the facets should be considered "in their totality." 407 N.W.2d 873, 879.[6]

Certain facets are at least partially favorable to HPP's claim that it was operating a dealership. For instance, HPP highlights its two-year effort to promote Camus products in a market where Camus was previously unknown, asserting that it invested its previously earned goodwill and lent its well-regarded name to the promotion of Camus products. This undoubtedly helped Camus build a reputation of its own and introduced its products to the Wisconsin and Upper Michigan territories.

It is true that there is some inkling of unfairness involved if Camus were to reap the benefits of HPP's good name and then sign on with another dealer.[7] Yet even while it is possible to understand the unfairness of allowing Camus to trade on HPP's good name, it is difficult to see how HPP's "goodwill" investment will now be lost. First, there is no indication that HPP's good name will somehow be tarnished or less respected due to the fact that it promoted a product line that it will no longer carry. Second, even accepting HPP's claim that it spent significant efforts promoting Camus products, those efforts were compensated in the form of some $1.1 million in revenues

---

[6]Because I find little likelihood that HPP operated a "dealership," I do not consider Camus' claim that HPP "rejected" a community of interest when it sold a competitor's products. While I find that to be a relevant factor, it is not dispositive on its own. Similarly, I reject HPP's contention that because Camus "admitted" the WFDL applied because the Representative's Agreement provided it would be governed by the law of the territory state. HPP also notes that Camus issued a notice and opportunity to cure as though the WFDL applied. First, Camus specifically refused to agree that HPP was a dealership; the fact that it chose to cover all its bases does not somehow transform HPP into a dealership. Second, saying that one state's law governs a dispute does not mean that a party is a "dealership" under that law.

[7]HPP uses the term "goodwill" more in terms of its own reputation than in an accounting sense.

8

during their two-year relationship. *Home Protective Services, Inc. v. ADT Security Services, Inc.*, 438 F.3d 716, 720 (7th Cir. 2006) ("funds HPS invested in marketing the ADT name over the years may well have been recouped via increased sales during that time"). It is not as though HPP directed significant efforts at product promotion only to have Camus pull the rug out before HPP could make any sales. In other words, even if HPP did contribute its good name to the enterprise, it did not "waste" that expenditure. As such, this is not a case where the would-be dealer's investment in a business relationship would allow it to be exploited by the manufacturer – the arrangement was *mutually* beneficial on an ongoing basis. Accordingly, though HPP's "goodwill" investment may be somewhat favorable to its dealership claim, it is mitigated by the fact that its investment was wholly or at least partially recovered during the parties' relationship.

HPP also argues that its employees devoted a significant amount of time to developing the Camus line. There is some dispute about how much time HPP's employees devoted to selling Camus products, but HPP claims its employees spent 30% of their time selling Camus boilers and four of them even flew to Camus' Canadian plant to learn more about the products. HPP points out that because it represents twenty other manufacturers, these other companies each receive only about 4% of HPP's efforts (the remaining 70% of HPP's time divided by 20 companies). Therefore, HPP argues, it spent "nine or ten times" as much time and effort on Camus products.

This kind of calculation smacks of gerrymandering and artificiality. As set forth in the briefs and elaborated on at the hearing, HPP had been a successful company for many years prior to its relationship with Camus. Yet we are now asked to believe that Camus, a product line HPP sold for only two years and which accounts for only about one-tenth of its sales, is suddenly nine or ten times more important than any other product line. Moreover, HPP did not add any staff to service

9

and sell this important line: in fact, it was only when Camus sought to end the relationship that it proposed adding new staff to placate Camus.

Although the 30% figure is somewhat dubious, at the preliminary injunction stage I am prepared to accept it at face value. Even so, I am persuaded that this amount of effort does not evidence a community of interest in these circumstances. As noted with respect to HPP's goodwill investment, HPP's efforts were not for naught: without them, it would not have sold more than a million dollars' worth of Camus' products. Accordingly, although HPP might irretrievably lose some of the efforts and Camus-specific know-how it developed, this does not leave HPP any more over a barrel than a typical vendor whose source of popular products dries up. *Home Protective Services*, 438 F.3d at 720 (security system reseller not dealership even though it derived 95% of revenue from, and devoted 95% of its personnel hours to, one provider).

HPP also argues that it provides a significant amount of supplementary services to Camus customers. It provides start-up services and sends a boiler technician to customers to test the boiler's installation and operation. It also offers a one-year warranty and provides other services one would expect from a retailer of boiler systems. Yet these services are not particular to Camus itself; presumably HPP provides a comparable level of service to all of the lines it sells. Moreover, as with the other facets, there is little about these supplementary services that would distinguish HPP from a typical vendor. Department and appliance stores offer setup of large, sometimes complex, products and systems. They also offer warranties. In *Home Protective Services,* for example, the alleged dealer sold and installed security systems for ADT, but the Seventh Circuit gave short shrift to the dealership claim even though 95% of the plaintiff's business came from the defendant. *Id.* Ultimately, the services HPP provided are part-and-parcel of its business model and

10

were rewarded by contemporaneous sales volume and profits. There is nothing inherent in the services it provided that is suggestive of the sort of interdependence required for HPP to constitute a dealership.

HPP also cites the fact that it was granted an exclusive territory in the Wisconsin and Upper Michigan territories. In reality, however, the exclusivity provision limited only *Camus*, the alleged grantor. HPP evidently felt free to sell numerous other manufacturers' products, which is the cause of the present dispute. To the extent an exclusive relationship can signify an earmark of a dealership, it is only when the dealer sacrifices his ability to sell other competing products in order to sell the grantor's. The dealer's *quid pro quo* is a form of "sunk" grantor-specific investment that assumes the business relationship will continue – the dealer accepts a limitation on what he can presently sell in the hopes that development of the grantor's line will prove lucrative and will outweigh his inability to sell competing products. If the dealer makes this sacrifice, it can certainly be one facet of their relationship suggestive of a dealership entitled to the WFDL's protections. Here, however, it is unclear why the exclusivity provision in the Representative's Agreement – which HPP essentially ignored – should be seen as evidence of interrelatedness or dependence. If anything, HPP's failure to stop selling competing products suggests an absence of interdependence.

Similarly, the other facets do not tilt strongly towards the finding of a dealership. While the parties dispute the extent to which HPP became identified with the Camus brand by using its name or marks, it is difficult to discern how a company that has been selling numerous lines (including boilers made by a competitor) for 35 years would become identified with a single line it added less than two years ago merely by using its trademarks in its brochures, etc. *Van Groll v. Land O'Lakes, Inc.,* 310 F.3d 566, 570 (7th Cir. 2002) ("defining 'dealership' in terms of trademark use is meant

11

to protect against situations in which a dealer spends money advertising for or promoting a company, an investment that is lost when the company terminates the relationship.")

Indeed, the fact that the length of the parties' relationship was quite brief is significant, especially considering that HPP touts its own long history of operating in Wisconsin. In some sense, this facet demonstrates how HPP is hamstrung by its own success: to the extent HPP was a respectable and successful business for several decades (which is why Camus chose it as a seller), that merely underscores the fact that HPP is hardly the sort of dealer that needs protection from the market power of a large manufacturer. HPP was doing fine before it started selling Camus products, and the relative brevity of the relationship, combined with the other facets, suggests that HPP's financial health was not at all dependent upon its relationship with Camus.

By the same token, HPP invested an "admittedly modest" amount of money in advertising Camus' products. Once again, this evidences the absence of any unrecoverable costs devoted to the Camus product line. Similarly, the business relationship was subject to relatively mild obligations. As noted, HPP was supposed to be an exclusive dealer, but it did not limit its own sales exclusively to Camus products. The Representative's Agreement imposed such pedestrian requirements as the maintenance of an office, the employment of sales people, having a stock of replacement parts, etc. (Darling Decl., Ex. 1.) Yet HPP, of course, already had offices and sales staff. The only significant contractual requirement is that HPP was to use its best efforts to sell Camus products and maintain a stock of replacement parts. While these are suggestive of a limited amount of mutual financial interdependence, such requirements would be expected of any company engaged in selling and installing large or complicated systems like boilers. In other words, the existence of these requirements does not suggest that HPP's financial health would somehow be threatened in the

12

event the relationship were terminated. Tellingly, the contract states that either party may terminate the arrangement for any reason with only 30 days' notice. Although the WFDL would trump this provision, the parties' own agreement suggests that they viewed the relationship more casually than HPP now claims. Ultimately, there is little about the obligations imposed on HPP that suggests a significant level of interdependence between the parties.

In sum, it is difficult to envision HPP as a dealership when it has minimal sunk costs and only one-tenth of its sales and profits coming from the alleged dealer. Added to these hurdles is the fact that in this case we have direct evidence of the parties' bargaining power and we need not speculate about whether Camus had HPP over a barrel – it didn't. Camus tried several times to cajole HPP into dropping competing lines and was even mellifluous in its praise of HPP and its president. Camus failed. For all its threats and sweet talking, it is apparent that Camus simply lacked sufficient financial power over HPP to persuade it, much less bludgeon it, into accepting its terms. *Praefke,* 255 F.3d at 465 (alleged dealer's "commitment to those products is too small to enable Tecumseh to bludgeon it into accepting inferior terms."). Accordingly, I conclude HPP has only a negligible chance of showing that it was a dealership entitled to the WFDL's protections.

**V. Other Preliminary Injunction Considerations**

A finding that HPP is unlikely to succeed on the merits is sufficient on its own to justify the denial of preliminary relief. I also note, however, that the other showings required for such relief are absent. First, the facts as presently developed make clear that HPP is merely facing a loss of business rather than a threat to its financial well-being. While this fact was suggestive of the absence of a community of interest, it also undermines HPP's claims that there is no adequate remedy at law and that it will suffer irreparable harm absent injunctive relief. In short, this case is

13

about money – a loss of future profits, really – and the Seventh Circuit made quite clear in *Praefke* that circumstances like these do not warrant equitable relief:

> But because Tecumseh parts are only a small part of Praefke's business (about 13 percent of its total sales revenues and a slightly higher percentage of its profits, before Central Power replaced Industrial Engine), Praefke's profits have not fallen to a point that threatens its solvency. Its losses are purely financial, easily measured, and readily compensated. There is therefore no showing of irreparable harm, . . . and on this ground alone the preliminary injunction should have been denied.

255 F.3d at 463.

Camus, on the other hand, in the event a preliminary injunction was issued, would be forced to continue to rely solely on the efforts of HPP to sell its products in Wisconsin and the Upper Peninsula. Given its previous concern over HPP's divided loyalties, Camus has even greater cause for unease if forced to continue in a relationship that it is in the process of trying to sever. As Judge Gordon remarked in denying a motion for a preliminary injunction under similar circumstances, "a court 'should hesitate before granting a preliminary injunction which would require defendants to indefinitely entrust the marketing of their product in a wide area to a distributor with whom a relationship of confidence and cooperation has become impossible.'" *Jack Walters & Sons Corp. v. Morton Bldgs, Inc.*, 1978 WL 1521, *6 (E.D. Wis. July 18, 1978) (*quoting Deltown Foods, Inc. v. Tropicana Products, Inc.,* 219 F. Supp. 887, 891-892 (S. D. N. Y. 1963)).

Finally, I have substantial doubts that the public interest would be served by granting an injunction in a case like this. Denying HPP's motion will not result in any loss to the public. Camus has already arranged for another distributor to market and sell its line of boilers in the Wisconsin and Upper Peninsula area, and HPP will continue selling the remaining lines. The resulting competition may well benefit the public in the form of lower prices. While the Wisconsin

14

legislature, in enacting the WFDL, has determined that the public interest of its citizens also lies in providing strong protection for its dealers, I am not convinced that denying the preliminary relief HPP seeks now will significantly impair this interest in the event HPP ultimately proves it is an intended beneficiary of that law.

**VI. Conclusion**

For the reasons stated above, I conclude that HPP has a minimal likelihood of success on the merits; I further conclude that the other factors required for the issuance of preliminary injunctive relief are not met. Accordingly, the motion is **DENIED**.

Dated this   18th   day of September, 2007.

s/ William C. Griesbach  
William C. Griesbach  
United States District Judge
